UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| RYAN VANOVER, | ) |
| Plaintiff, | ) |
| v. | ) Case No. 1:25-cv-193 |
| MICHAEL L. CHAPMAN, | ) |
| and | ) |
| KIMBERLY HOLWAY, | ) |
| Defendants. | ) |

COMPLAINT

Preliminary Statement and Jurisdiction

1. Over a period of months, health care providers at the Loudoun Adult Detention Center ("ADC") failed to give proper medical care to Ryan Vanover, a diabetic inmate who had increasingly severe diabetic ulcers on his feet. For months on end, Mr. Vanover was never given access to a medical doctor, wound-care specialist or podiatrist, being seen only by a physician's assistant who misdiagnosed him and mismanaged his care. Eight months after his arrival at the ADC, Mr. Vanover suffered the amputation of his right foot, so as to prevent an untreated infection from a diabetic ulcer from spreading further. Mr. Vanover now sues for damages resulting from his failure to receive the care he manifestly required. This lawsuit arises under the Eighth Amendment to the United States Constitution and 42 U.S.C. §1983, and under the American With Disabilities Act, 42 U.S.C. §12101 *et seq.,* the Rehabilitation Act of 1973, 29 U.S.C. §794 *et seq.* and the Affordable Care Act, 42 U.S.C. §1811 *et seq.* The Court has

jurisdiction pursuant to 28 U.S.C. §1331. The Court has supplemental jurisdiction over the state law tort claims for gross negligence that arise out of the same nucleus of operative facts as give rise to the federal claim.

Note re Bankruptcy of Wellpath LLC

2. Wellpath LLC, employer of the medical staff at the ADC, contracts to provide health care to incarcerated inmates for profit. At all relevant times, it was under contract to discharge the government's constitutionally mandated function of providing necessary health care to ADC inmates, including Mr. Vanover. As such, Wellpath's employees and agents served as state actors subject to the provisions of the Eighth Amendment and 42 U.S.C. §1983.

3. Wellpath is currently in bankruptcy and thus not sued here. The Texas court presiding over Wellpath's bankruptcy has temporarily stayed litigation against any Wellpath employees. Contemporaneously with the filing of this complaint, Mr. Vanover has filed a motion seeking three forms of relief:

* Authorization to serve a subpoena on Wellpath for the sole purpose of securing the full names of intended defendants currently known as nurses Ashley, Stephanie and Joe,
* Authorization, once the names of the referenced nurses are known, to file but not serve an amended complaint against Wellpath employees setting forth Mr. Vanover's claims against them, and
* A stay of proceedings in this case pending this Court's action in light of further rulings by the Texas bankruptcy court.

Parties[1]

4. At all relevant times, plaintiff Ryan Vanover was a 42-year old ADC inmate serving a sentence for construction fraud. He was released from the ADC in November, 2023. At all relevant times he had, and was known by defendants to have, diabetes.

5. Defendant Michael L. Chapman was at all relevant times the sheriff of Loudoun County and keeper of the ADC. As keeper of the ADC he was constitutionally charged to arrange for the provision of adequate health care to the inmates in his custody, including Mr. Vanover. At all relevant times defendant Kimberly Holway was the chief correctional officer within the sheriff's office, in charge of supervising Wellpath personnel providing medical services at the ADC and acting as the principal point of contact for the sheriff's office with Wellpath personnel. Defendants are sued in their individual capacity for damages.[2]

Claim for Relief

6. Ryan Vanover is the former owner and operator of his own construction business. In 2021 and 2022 he was convicted of construction fraud in five Northern Virginia jurisdictions. He was sentenced to probation in three counties and sentenced to periods of incarceration in two: Prince William and Loudoun Counties.

---

[1]No Wellpath employees are named as parties in this version of the complaint. On receipt of the full names of certain nurse defendants, Mr. Vanover seeks to file an amended complaint naming Wellpath employee defendants, with the litigation being stayed until the bankruptcy court permits claims to be prosecuted against Wellpath employees. See ¶3 *supra.*

[2]These two defendants will be voluntarily dismissed from this suit on a finding that they reasonably relied on Wellpath personnel to care for Mr. Vanover, and remained ignorant of the severity of his condition until his foot was amputated.

7. In October 2022, Mr. Vanover began serving a twelve-month sentence in the Prince William jail. At the time of this, his first, incarceration, he knew, and informed ADC medical and nursing personnel, of his diabetes. His feet were then in normal condition, and he was not given any foot care or warnings about feet.

8. At the Prince William jail, Mr. Vanover was properly treated for his diabetes. He received insulin injections daily, had his blood sugar tested twice daily, and was fed in accordance with a low carbohydrate diet appropriate for diabetics, including eggs, fruit, and virtually no bread or pasta. He was free to remain in his cell, and thus lie down and elevate his feet if he so desired. Given the attention being paid to his diabetes, his blood sugar levels were maintained at satisfactory levels.

9. On February 9, 2023, having been sentenced in Loudoun County to serve 25 months in jail, Mr. Vanover was sent to the Loudoun County Adult Detention Center ("ADC"), where he remained until his right foot was amputated on October 14, 2023.

10. At all times during his incarceration in the ADC, Mr. Vanover was under the care of and reliant solely on defendants for his medical needs. Wellpath touted its staff to Loudoun County as providing healthcare of the highest quality to ADC inmates, including Mr. Vanover.

11. Wellpath's actual provision of care to Mr. Vanover belied the company's glowing representations regarding its promised provision of high quality health care at the ADC. Even as Mr. Vanover's foot problem refused to heal and went from bad to worse, and despite his ongoing request for appropriate medical assistance, he never saw a doctor during the eight months of his incarceration at the ADC. There is no record that P.A. Piazza consulted with any supervising doctor or podiatrist, including Wellpath's Dr. Jerkins, as required by law, no record

that Dr. Jerkins involved himself in any way with Mr. Vanover's treatment, and no record that HSA Mason concerned herself in any way about Mr. Vanover's condition – until his foot was amputated.

12. Shortly after Mr. Vanover arrived at the ADC, nurse Ashley informed him that his daily blood sugar checks were being discontinued. For approximately two months, he was placed instead on weekly checks. The blood work was done after breakfast, and thus with Mr. Vanover not fasting, as is standard procedure for diabetic blood checks. All this was done with the knowledge or expressly at the direction of P.A.Piazza.

13. Mr. Vanover requested a diet for diabetics, such as the one he had received at the Prince William jail. This was denied with the knowledge or expressly at the direction of P.A. Piazza and other Wellpath employees.

14. Mr. Vanover's blood sugar rose at the ADC from the 80-100 range, which was satisfactory for diabetics, into the 200s, which was excessive and unhealthy.

15. In the face of the medical staff's failure to provide him with appropriate health care addressing his diabetes, Mr. Vanover undertook to maintain an activity regimen to help him maintain healthy blood sugar levels. In service of this goal he began playing basketball whenever the ADC schedule would permit.

16. On or about March 5, 2023, after playing basketball Mr. Vanover noticed that he had developed open blisters, each the approximate size of 50-cent pieces, on the bottom of both his feet. The soles of both his socks were bloody. He reported his condition to ADC staff and was sent to the medical unit. There, his feet were cleaned and an antibiotic applied, covered by a band-aid. He was then sent back to his cell.

17. Inmates at the ADC had to purchase their own replacement socks from the commissary. Many did not do so, and walked and also played basketball in sneakers without socks. As a result, it was common for inmate to have and complain of blisters on their feet. While Mr. Vanover knew he had diabetes, he did not make any connection between that condition and his foot problems. Nor did any Wellpath medical staffer tell or so much as suggest to him that what was at issue was diabetic ulcers.

18. Mr. Vanover was not given additional band-aids or ointment for use in his cell. When he needed to change his band-aids he had to go to the medical unit, or, later, the ADC's control room, typically twice a day. He was not given any instructions relative to care for his feet. Every time he saw anyone for his feet this was in response to his having made a request.

19. Following his filing a grievance complaining of inattention to his feet, Mr. Vanover was, in April, finally given one day's supply of band-aids and bacitracin to keep with him in his cell for use as needed.

20. As defendants knew, persons with diabetes should regularly elevate their legs to prevent or reduce swelling and improve circulation. Unlike the case at the Prince William jail, in Loudoun inmates were locked out of their cells during the day. They remained in a common area that lacked means for Mr. Vanover to elevate his legs. Defendants knew that Mr. Vanover was on his feet virtually his entire waking day, except when on lockdown.

21. On or about March 7, 2023, Mr. Vanover sought care for both his feet. He was seen by P.A. Piazza, a physician's assistant. P.A. Piazza noted that Mr. Vanover was "experiencing swelling in both feet." Notwithstanding his knowledge that Mr. Vanover was diabetic, that persons with diabetes are at risk of developing diabetic ulcers on their feet, and that the open

sores on the bottom of Mr. Vanover's feet looked like (because they were) diabetic ulcers, P.A. Piazza styled them "healing sore[s] consistent [with] blisters." He sought no confirmation of his inept diagnosis from a medical doctor, a podiatrist or a wound specialist. He concluded that Mr. Vanover had developed a fungal infection in his feet, and prescribed an antifungal medication, as well as Motrin for pain.

22. On March 10, 2023 Mr. Vanover, experiencing unresolved pain and swelling in both feet and lower legs, was seen again by P.A. Piazza. P.A. Piazza confirmed the swelling in both legs, noted "healing sores" on the balls of both Mr. Vanover's feet, and prescribed an oral antibiotic for what he ineptly viewed as foot infections rather than the diabetic ulcers they were.

23. Through March, 2023, Mr. Vanover reported to Wellpath personnel and P.A. Piazza specifically, of pain, swelling and bleeding from the open ulcers on the bottom of both his feet. The ulcers were not closing up, notwithstanding the routine application of band-aids and topical antibiotic ointment. On each occasion, he received the same reactive and minimizing responses, and the same provision of band-aid, anti-fungal ointment, and occasionally Motrin, by Wellpath's healthcare personnel, and P.A. Piazza in particular.

24. P.A. Piazza's mis-diagnosis and resulting inefficacious treatment regimen did nothing to resolve Mr. Vanover's foot ulcers and pain. On March 14, 2023 he returned to P.A. Piazza for swelling in both legs. The pain and swelling in his legs persisted regardless of the misguided anti-fungal guided care afforded him by Wellpath staff and P.A. Piazza in particular.

25. Mr. Vanover's foot ulcers routinely bled through the bandaids he was given, and his sheets were routinely soiled with blood from his feet. He routinely reported this to Wellpath personnel, including P.A. Piazza. Nothing to this effect appears in his Wellpath progress notes.

26. Until early April, neither P.A. Piazza nor any other Wellpath employee arranged for Mr. Vanover to be seen daily for care of his diabetes and his feet in particular. Nor was Mr. Vanover advised that it was in his interest to be seen daily, and when he was seen, his was because he independently sought out care. He was routinely told by P.A. Piazza and nurses Ashley L.N.U., Stephanie L.N.U., and Joe L.N.U. that while bothersome, his condition was not serious and would improve with the antibiotics and band-aid he was being given to apply. P.A. Piazza described his diabetic ulcers as "healing sores on the ball of both feet bottoms" and diagnosed him with "bilateral L[ower] E[xtremity] edema with possible foot infections." Nurse Mason characterized his condition as "routine," with no immediate intervention necessary.

27. Until early April when Mr. Vanover grieved his lack of medical care, his blood sugar was not being monitored daily as appropriate, nor was he receiving insulin.

28. Throughout his incarceration at Loudoun, a diet suitable for diabetics was not made available to him, as it had been at the Prince William jail . The ADC commissary sold healthy items he could safely eat – *e.g.* canned mackerel and tuna – but limited the quantity available. Honeybuns were sold without limit, and Mr. Vanover routinely purchased them not to eat but to trade for healthy food.

29. The ADC ran a work release program for qualifying inmates. The work-release program permitted inmate-participants to perform a period of supervised landscaping, outdoor maintenance and light construction work on site and at Loudoun county parks, following which they could seek employment with a local private employer. Securing work release was useful to inmates, as participation in the program permitted them to reenter civil society, if on a restricted basis, permitted them to earn money, and yielded a reduction in the time remaining to be spent in jail.

30. Mr. Vanover was eligible for work release so long as he was of good behavior and could pass a medical check. He was of uniformly good behavior at the ADC, and eager to participate in the work-release program.

31. By early May, 2023, Mr. Vanover had completed the required period of incident-free confinement that permitted him to apply for participation in the work release program. On or about May 9, he was scheduled for an appointment with P.A. Piazza to be evaluated for work release. At this time, the ulcers in Mr. Vanover's feet, now over over two months old, still had not healed. He was continuing to treat them with the bandaids provided by Wellpath staff, including P.A. Piazza.

32. Prior to P.A. Piazza's May 9 examination of Mr. Vanover for work-release purposes, Wellpath nurses Mary L.N.U. and Yvonne L.N.U., realizing that Mr. Vanover had diabetic ulcers, not blisters or infections, on both his feet, had on their own initiative properly cleansed, medicated, and wrapped his feet using appropriate bandages, not band-aids. After they had done so on a few occasions P.A. Piazza found out about it. He overruled their assessment and

recommended care and directed them to stop cleansing and bandaging Mr. Vanover's feet, and to leave him with band-aids and bacitracin. Reluctantly, they did as instructed.

33. At the time of his application for work-release, Mr. Vanover understood from P.A. Piazza – Wellpath's medical authority at the ADC so far as Mr. Vanover knew – that all he had was blisters or a fungal infection in his feet, which, while they were not getting better, were not getting worse either. He also understood, from P.A. Piazza, that in the view of the presiding medical authority, he did not require the cleansing and bandaging of his feet that two nurses had briefly provided. Eager to join the work-release program and unaware, in the circumstances, of any medical reason why he should not do so, Mr. Vanover was confident he was physically able to participate in work-release.

34. P.A. Piazza cleared Mr. Vanover for work-release. The treatment he prescribed for Mr. Vanover's feet was "continued bandaids as needed." In a woeful disregard of standard and obvious medical protocol, P.A. Piazza did not condition Mr. Vanover's participation in the work release program on the resolution of his foot ulcers.

35. On or about May 10, 2023, Mr. Vanover moved to the work-release housing unit. He was assigned to landscaping and light construction work Monday through Friday, for an average of 7-8 hours per day. Like all other inmates on work release, he was given and required to wear steel-toed boots.

36. On or about June 16, 2023, Mr. Vanover was seen by nurse Stephanie Bizon in ADC medical unit. His left foot was red and warm to the touch from his toes to his mid arch, suggestive of infection. The wound on the bottom of the foot remained open and draining. Concerned, nurse Bizon contacted P.A. Piazza, who was not then at the ADC. P.A. Piazza

ordered a ten-day prescription of Augmentin, an antibiotic used to treat bacterial infection, and recklessly authorized Mr. Vanover's return to work.

37. On or about July 23, 2023, Mr. Vanover's crew leader saw him limping and brought him to Sergeant Gordon, who was in charge of the work-release program. Sgt. Gordon was concerned at Mr. Vanover's condition and wished to assist him as a responsible and cooperative work-release participant. He knew that if Mr. Vanover remained in the work-release housing unit, he would be able to rest and elevate his feet – something virtually impossible in general population in the ADC since inmates were locked out of their cells during the day.

38. Sgt. Gordon directed Mr. Vanover to remain in the work-release housing unit for one month, without working, in order to give his feet a chance to heal. During this month, Mr. Vanover received no treatment for his foot ulcers other than his band-aids and over-the-counter ointment. Mr. Vanover did not see P.A. Piazza during his month of rest.

39. On August 22, 2023, Mr. Vanover was seen by P.A. Piazza for a three-month check received by all inmates. While noting that Mr. Vanover had diabetes, he prescribed no more than the usual band-aids and bacitracin for his ulcerated feet. At no time did he limit Mr. Vanover from working.

40. On September 24, 2023, having completed his initial supervised landscaping work, Mr. Vanover was cleared to seek paid employment with a private employer. While he was initially accepted into a managerial position at a Harris Teeter store in Leesburg, he could not take the job, as ADC protocol required paper paychecks and Harris Teeter paid only electronically. He thereupon took a job as a waiter at the All-American Steakhouse in Ashburn, beginning October 7, 2023.

41. Mr. Vanover's work as a waiter required that he be on his feet constantly for the 8 to 12-hour work day, and so he was for the next six days.

42. Wellpath policies and procedures provided for routine medical attention to ADC inmates at 4 AM, 11AM, 4 PM, and 8 PM. Mr. Vanover was scheduled to receive his insulin injections at 4:00 PM. While working as a waiter, during most of those times Mr. Vanover was away from the ADC. He was thus unavailable to receive his insulin as scheduled. When he inquired about receiving medical care before and after his work day, he was told that the staff could not accommodate him without approval, which was not forthcoming from any Wellpath authority.

43. Approval for out-of-routine-time provision of medical care to Mr. Vanover while he was known to be working outside the ADFC was either not requested, or if requested was denied by Wellpath personnel. This was the result of either an arbitrary and capricious Wellfare corporate policy, or an arbitrary and capricious decision by P.A. Piazza, or another Wellpath employee not to request same, or to deny same. The result was that from October 8 through October 13, 2023, Mr. Vanover received no insulin except on one occasion when a nurse gave him a shot out of schedule. Nor did he receive the three mandated blood sugar tests per day.

44. Mr. Vanover was reluctant to lose his job just because his feet hurt. He continued to operate under the belief, based on Wellpath personnel instruction and actions, that his feet simply presented a painful physical problem. He had no clue of the medical disaster he was courting.

45. By October 13, 2023, Mr. Vanover's feet had swollen and painful to the point that he left work early. He then had to be cleared by the medical unit before returning to work.

46. Mr. Vanover was told he would be taken to the ADC medical unit after dinner on October 13, at 4:30 PM. This did not happen. At 5:00 P:M he was told that he would be taken to the medical unit after the 6:00 PM shift change. This did not happen. At 9:00 PM he was given Advil for pain and told he would been seen for his feet "later." This did not happen.

47. The next day, October 14, Mr. Vanover was brought to the medical unit around 4:00 AM. His feet were viewed by nurse Mary, who said she would "call the doctor," and on information and belief called a doctor, possibly Dr. Oscar Jerkins, or P.A. Piazza. Nurse Mary admitted Mr. Vanover to a medical cell.

48. At around 8 AM on October 14, nurse Ashley and and a sheriff's deputy brought Mr. Vanover to the ADC's examination room. They both took photographs of his feet and texted the photographs they had taken to unknown third parties. They then returned Mr. Vanover to his medical cell.

49. For hours, no health-care personnel came to see Mr. Vanover. Around noon the same day – eight hours after his belated examination in the medical unit and about 24 hours after first reporting his foot problems – he was transported to Loudoun Inova Hospital for evaluation and treatment.

50. At the Inova Hospital, Mr. Vanover was given a wheelchair and promptly examined and x-rayed. The doctors immediately concluded that his diabetic ulcer on the bottom of his right foot had developed an infection so severe and dangerous that he required a below-the-knee amputation. This procedure was performed within a few hours of his admission.

51. During the week that Mr. Vanover remained in the hospital, apart from receiving post-operative care for his amputated right leg he received daily cleansing, medication and wrapping of the ulcer on the bottom of his left foot. This care was reminiscent of the aid briefly provided by nurses Mary L.N.U. and Yvonne L.N.U. until ordered by P.A. Piazza to stop. The condition of his left foot improved.

52. Mr. Vanover returned to the ADC under doctor's orders to stay off his foot. He was provided with a wheelchair and placed in a handicap cell with appropriate railings for toilet and private shower use. ADC nurses continued the foot care treatment prescribed by the hospital for Mr. Vanover's remaining foot, which continued to improve. Mr. Vanover also showered daily.

53. At all relevant times, under its governing contract Wellpath was the "medical and psychiatric healthcare director for all correctional housing facilities under the authority of the Sheriff's Office."

54. Despite Mr. Vanover's obvious limitations and need for handicap accessibility, and over his vigorous opposition, on or about November 14, 2023**,** Wellpath, by nuirse Mason or other corporate decision-maker, moved him out of his handicap cell to a non-handicap cell within the medical unit. This move created mobility problems for Mr. Vanover, who got around with crutches or a walker and needed grab-bars to attend to his needs without undue and avoidable difficulty. As of the time Mr. Vanover was moved from the handicap cell, and until he left the ADC, the handicap cell he had occupied remained unoccupied.

55. The cell to which Mr. Vanover was assigned in mid-November lacked a private shower facility. To shower, Mr. Vanover would have had to use the communal shower stalls serving this cell. The communal shower stall contained no barrier between the shower and the

toilet. The shower was used by drug addicts and mentally ill persons assigned to the ADC's medical unit, many of whom did not observe appropriate personal hygiene. The showers and floor were routinely wet with urine and filthy.

56. Given the open sore on his remaining left foot, following his transfer in November, Mr. Vanover declined to shower until his release from the ADC two weeks later. Instead, he cleansed himself as best he could with water from the sink in his cell.

57. Through his release from the ADC, Mr. Vanover received no further accommodation for his physical restrictions or his heightened need for sanitary conditions to avoid infection to his healing injuries.

58. During the entire period of Mr. Vanover's inarcertation, defendant Michael L. Chapman had been sheriff of Loudoun County and keeper of the jail. As sheriff, it was his constitutional obligation to see that the inmates committed to his supervision receive necessary medical care. On information and belief, during routine meetings or on an *ad hoc* basis, he would have been apprised by his chief correctional officer defendant Holway, or directly by Wellpath staff, of serious medical problems with ADC inmates. Upon being so apprised, it was his responsibility to see to it that such serious medical problems were promptly and adequately addressed with such medical intervention as was appropriate.

59. During the entire period of Mr. Vanover's incarceration in the ADC, defendant Holway had been a major in the sheriff's office, chief correctional officer, and responsible for administrative supervision of the provision of medical care by Wellpath employees. She served as the principal point of contact for the sheriff's office with Wellpath personnel charged to provide medical care at the ADC. On information and belief, during routine meetings or on an

*ad hoc* basis, she would have been apprised by Wellpath staff, including defendants herein, of serious medical problems with ADC inmates. Upon being so apprised by Wellpath staff, it was her responsibility to see to it that such serious medical problems were promptly and adequately addressed with such medical intervention as was appropriate.

60. On information and belief, in the ordinary course of their duties defendants Chapman and Holway would have been apprised of Mr. Vanover's persistent and worsening foot problem. Yet they took no steps to cause him to receive appropriate care, to the point that in due course his foot had to be amputated.[3]

61. On or about November 27, 2023, Mr. Vanover was released from the ADC to live with his father in home confinement for the balance of his sentence. He was given an electronic ankle bracelet to monitor his locations, as he was given leave to work outside the home in an approved position, which he did until being advised by his doctor to stay off his feet.

62. Following his return home, Mr. Vanover began receiving care for his left foot from a non-ADC wound specialist, and the sore on that foot was fully healed within a few weeks.. Had this appropriate level of care been provided to Mr. Vanover from the beginning, the amputation of his lower right leg and the pain and suffering he endured to that point could have been avoided.

63. As a result of defendants' actions set forth above, Mr. Vanover lost his right foot; suffered past, present and future pain, including "phantom pain" in the lost foot; severe emotional distress requiring mental health medication for depression and anxiety; humiliation and embarrassment; substantial financial expenses associated with necessary medical care and

---

[3] *See* n.2 at 3, *supra.*

replacement of his prosthesis for the rest of his life; significant loss of income due to his inability lawfully to continue doing the construction work he had successfully done prior to his incarceration; unjustified denial of accessible accommodations for two weeks; and other losses.

## Causes of Action

### Count I

### Eighth Amendment Violation: Deliberate Indifference to Serious Medical Need

64. By their actions and inactions set forth above, for over half a year, defendants demonstrated deliberate indifference to Mr. Vanover's serious medical condition, specifically, the heightened risks and healing difficulties experienced by Mr. Vanover as a patient with diabetes suffering over time with open wounds to his feet. This pattern of deliberate indifference led to unreasonable and glaringly insufficient medical care, protracted pain and suffering, and the unnecessary amputation of Mr. Thompson's right foot, leaving him permanently disfigured and disabled. The claim for his resulting damages arises under the Eighth Amendment to the United States Constitution and 42 U.S.C. §1983.

### Count II

### Violation of Americans With Disabilities Act, Rehabilitation Act, and Affordable Care Act

65. In the period following the amputation of his foot, Mr. Vanover was a handicapped person within the meaning of the Americans With Disabilities Act, the Rehabilitation Act, and the Affordable Care Act. As set forth above, he needed, and initially was placed in, an ADC cell equipped for handicapped individuals such as himself. Yet defendants knowingly suffered him

to be evicted rom that cell for no reason, leaving it empty until his release from the ADC two weeks later. In so doing, they violated his rights under both referenced acts, giving rise to his claim for damages for being forced to live for two weeks in unsanitary and unsafe conditions, in derogation of his rights as a handicapped individual in defendants' care.[4]

## Count III

## Gross Negligence

66. By knowingly suffering Wellpath personnel to deny Mr. Vanover manifestly necessary medical care as set forth above, defendants demonstrated gross negligence materially contributing to his suffering and loss of his foot.

***

Wherefore, Mr. Vanover asks this Court for an order:

* Granting him actual damages and punitive damages against the defendants, jointly and severally, appropriate to the proof at trial;
* Awarding him costs and reasonable attorney's fees; and
* Granting such other relief as is just.

Mr. Vanover requests trial by jury.

Respectfully submitted,

RYAN VANOVER,

By counsel

---

[4]Any defendants found not to be complicit in the decision gratuitously to remove Mr. Vanover from his handicap-accessible cell will be voluntarily dismissed from this count.

Dated: February 3, 2025

Counsel for Plaintiff:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com

**Vanover\Pleadings\2025-0203Complaint**

//s// Abigail S. Grand
Abigail S. Grand #100578 (Admission Pending)
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA 22314
703.684.1100 / Fax: 703.684.1104
agrand@robinhoodesq.com